## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| PARK RIDGE PRESBYTERIAN CHURCH, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 11 C 5321 |
| v. | ) ) | Judge Joan H. Lefkow |
| AMERICAN STATES INSURANCE COMPANY, | ) ) ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

After Plaintiff Park Ridge Presbyterian Church ("PRPC" or "the Church") experienced massive water damage in July 2010, its insurance carrier, American States Insurance Company ("ASIC"), denied coverage. PRPC filed suit against ASIC for breach of contract and violations of the Illinois Insurance Code. ASIC filed a counterclaim for a declaratory judgment that the causes of loss are excluded from PRPC's coverage. The dispute turns on what is clearly a question of fact: what caused the damage at the Church? Regardless, the parties filed cross motions for summary judgment. (Dkts. 64, 68.) The parties' respective motions are denied, although the court herein circumscribes the issues for trial in accordance with Federal Rule of Civil Procedure 56(g).[1]

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury

---

[1] The court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and there is complete diversity between the parties. Venue is proper pursuant to 28 U.S.C. § 1391(b).

1

could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). When considering cross-motions for summary judgment, the court must be careful to draw reasonable inferences in the correct direction. *See, e.g., Int'l Bhd. of Elec. Workers, Local 176* v. *Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). The court may not weigh conflicting evidence or make credibility determinations. *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011).

If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Id.* at 323. In response, the non-moving party cannot rest on bare pleadings alone but must designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).

# BACKGROUND[2]

## I.  The Church Structure

PRPC has three buildings on its property, one on the west end, one on the south end ("the South Sanctuary"), and one on the north end ("the North Building"). Both the South Sanctuary and the North Building have "light well walkways" adjacent to some of the exterior walls of their basements. One wall of the walkways is formed by the basement wall and the other is a concrete wall at least ten feet high facing the building. The buildings have downspouts from the roof gutters that drain into the light wells, where storm drains are embedded. The buildings contain other architectural features to deal with water, such as weep holes in the exterior walls of some of the light well walkways to relieve hydrostatic pressure.[3] In addition, the storm drains in the walkways flow into basins under the boiler room in the South Sanctuary's basement. The basement also contains a floor drain in the boiler room, recessed floor urinals, and showers with a four inch shower pan. The showers lead to the storm drain system. Electric pumps pump water from the basins into a sewage ejector well that flows into the city sewers.

## II.  The Insurance Policy

ASIC issued PRPC an insurance policy covering events occurring from October 1, 2009 through October 1, 2010 ("the Policy"). Section B of the Policy is an exclusion section that lists

---

[2] The facts set forth in this section are derived from the statements of fact submitted by the parties to the extent they comport with Local Rule 56.1. In considering each motion for summary judgment, they are taken in the light most favorable to the non-movant. In accordance with its regular practice, the court included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to the resolution of these motions. Any facts submitted that are not controverted as required by Rule 56.1 are deemed admitted. *See* L.R. 56.1(a); *see also*, *e.g.*, *Collins* v. *United States*, 894 F. Supp. 2d 1051, 1055 (N.D. Ill. 2012). The court notes that many of ASIC's Local Rule 56.1 paragraphs are actually long quotations from depositions. This is improper. Paragraphs in a Local Rule 56.1 paragraph should include only facts, be short, and be specific. *See Malec* v. *Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000).

[3] Hydrostatic pressure is "[t]he pressure exerted by a fluid at equilibrium at a given point within the fluid, due to the force of gravity." The Free Dictionary, "Hydrostatic Pressure," available at http://www.thefreedictionary.com/hydrostatic+pressure (last visited Sept. 12, 2014).

the types of damage excluded from coverage (including certain types of water damage). The preamble to the exclusion contains an "anti-concurrent clause," which states,

**COVERED CAUSE OF LOSS – SPECIAL FORM**

**B.     Exclusions**

   **1.**     We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

(Dkt. 67, ex. 8 at 2.) Section B.1.g of the policy dealt with excluded types of water damage, and this exclusion was modified by an endorsement. (Together, the endorsement and insurance policy shall be referred to as "the Policy.") As modified, the water exclusion section reads,

   **Water**

   **(1)**     Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

   **(2)**     Mudslide or mudflow;

   **(3)**     Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

   **(4)**     Water under the ground surface pressing on, or flowing or seeping through:

   1.     Foundations, walls, floors or paved surfaces;

   2.     Basements, whether paved or not; or

   3.     Doors, windows or other openings.

   **(5)**     Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **1., 3. or 4.,** or material carried or otherwise moved by mudslide or mudflow.

   This exclusion applies regardless whether any of the above, in Paragraphs **1.** through **5.,** is caused by an act of nature or is otherwise caused. . . .

4

(Dkt. 67, ex. 9 at 1.)

The water exclusion section is modified by a Religious Institutions Ultra Property – Plus Rider ("the Rider"). The Rider provides,

> **SECTION B.** CAUSES OF LOSS – SPECIAL FORM
>
> The following items are amended as shown. All other text and provisions of the indicated items remain as written in the CAUSES OF LOSS – SPECIAL FORM.
>
> | **Description of item with amended material:** | **Section** |
> |---|---|
> | EXCLUSIONS – Water that backs up from a sewer or drain. This exclusion is deleted. | **B.1.g.(3)** |

(Dkt. 67, ex. 10 at 14.) The Rider thus effectively states that ASIC *will* provide coverage for loss caused by "[w]ater that backs up or overflows from a sewer, drain, or sump[.]" (Policy at 2.)

## III. July 2010 Water Damage and ASIC's Denial of Coverage

On July 23 and 24, 2010, there was a massive storm and a subsequent power outage at PRPC. When Church members arrived on the morning of July 24, they observed large amounts of water in the light well walkways and stairs leading down to them and realized the basement had flooded with more than 100,000 gallons of water, causing extensive damage.

PRPC contacted ASIC about the water damage. It reported that there had been a power outage, causing the ejector pumps in the basement to fail. Because the pumps were not operating to evacuate water from the basement, PRPC explained, the basement had filled with water. ASIC sent an adjuster to the Church to make an initial inspection on August 13, 2010. PRPC also engaged an engineer, Karl Koenig, to write a report regarding the cause of damage. (Dkt. 67, ex. 15.) In his September 15, 2010 report, Koenig opined that "[t]he primary cause of the water accumulation in the Low Basement of the Church complex was the reported loss of

electrical power that prevented the ejector pumps from removing the normal and increasing quantity of ground water." (*Id.* at 4.) In the meantime, ASIC advanced PRPC $125,000.

On October 6, 2010, ASIC denied coverage for the damage (the repair of which was estimated to cost the Church over $1 million (Dkt. 82 ("Def. 56.1 Add. Resp.") ¶ 24.)). (Dkt. 67, ex. 17 at 6-15.) ASIC explained that it determined the cause of the basement flooding was "surface water and water under the ground infiltrating the Building envelope through door openings and the foundation walls," not the pump failure leading to a backup of the Church's sewer system. (*Id.* at 8, 14.) ASIC also cited weather conditions, improper maintenance of the Church's storm water collection system, and "substantial evidence of ongoing and chronic water intrusion through the basement foundation." (*Id.* at 8, 13.) ASIC further noted the anti-concurrent clause in the Policy providing that it would not pay for damage caused directly *or* indirectly, in whole or in part, by excluded events. Thus, "even if PRPC were able to establish that an amount of sewage water was able to bypass the backflow preventers, and enter the basement in addition to the surface and ground water, the [anti-concurrent clause] excludes any coverage for the loss." (*Id.* at 14.)

PRPC continued to assert that the damage to its basement was the result of the backed-up sewer or drain and ASIC had representatives of DocAir and Donan Engineering conduct a follow-up inspection. They concluded that the rainwater on July 23 and 24 combined with the water discharging onto the ground surrounding the structures and into the light well walkways from the downspouts to cause ground and surface water to infiltrate the building's foundation walls and slab. (*Id.* at 17.) ASIC reiterated its denial of coverage in a December 31, 2010 letter and sought recovery of the $125,000 that it had advanced the Church. (*Id.* at 24.)

**IV.     This Suit**

PRPC filed suit against ASIC in Cook County Circuit Court on July 6, 2011, and ASIC removed the suit to this court. (Dkt. 1.) PRPC then filed a two-count amended complaint for breach of contract and vexatious and unreasonable actions under the Illinois Insurance Code, 215 Ill. Comp. Stat. 5/155(1). (Dkt. 49.) ASIC filed an amended two-count counterclaim seeking a declaratory judgment that there is no coverage for PRPC's damages based on the water exclusion and for return of the $125,000 advanced to PRPC. (Dkt. 63.)

The parties filed cross motions for summary judgment (dkts. 64, 68), each relying heavily on expert opinions regarding the cause of the water damage. While the court has reviewed the exhibits attached to the motions for summary judgment, it will not detail each expert opinion here as there are disputes of material fact that render summary judgment inappropriate for either party. It briefly notes, however, the parties' experts predictably supported the parties' respective views.

The Church relies on the report that Koenig rendered in September 2010 and his deposition to argue that the cause of the damage was the pump failure due to the electricity loss, resulting in water flowing up through shower drains in the basement. ASIC responds that any water that may have existed in the shower drains would not have breached the top of the four-inch pans in the showers until the basement was flooded to an equal level of four inches of water. (Def. 56.1 Add. Resp. ¶ 16.) It also argues that Koenig stated in his deposition that surface and ground water flooded the basement, in addition to water that came up through the drains. (Dkt. 66 ("Def. 56.1") ¶¶ 26-29.)

ASIC relies on its own experts to argue that the water from the drain was not backing up or overflowing out of the shower drains. (Dkt. 80 ("Def. Add. 56.1") ¶¶ 43, 55.) Instead, it

argues that surface and ground water entered the basements through doors, cracks, and other openings to cause the flooding. (*Id.* ¶ 73.) In response, PRPC points to statements by ASIC's experts that the elevation of water in the light wells allowed water to be pushed backwards through the basement sewer lines to flood the basement. (Dkt. 76 ("Pl. Add. 56.1") ¶ 19.)

## ANALYSIS

Given the disputes of material fact as cited above, summary judgment is inappropriate. Regardless, there are a number of issues the parties present in their briefs whose resolution is necessary for trial and could help to facilitate resolution of this suit. *See* Fed. R. Civ. P. 56(g) ("If the court does not grant all the relief requested by the [summary judgment] motion, it may enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case."). The court is mindful that in interpreting the terms of an insurance policy, it should apply "the rules applicable to contract interpretation." *Founders Ins. Co.* v. *Munoz*, 930 N.E.2d 999, 1003, 237 Ill. 2d 424, 341 Ill. Dec. 485 (2010). "Insurance policies are to be liberally construed in favor of coverage, and where an ambiguity exists in the terms of the contract, the ambiguity will be resolved in favor of the insured and against the insurer." *Mount Vernon Fire Ins. Co.* v. *Heaven's Little Hands Day Care*, 795 N.E.2d 1034, 1039, 343 Ill. App. 3d 309, 277 Ill. Dec. 366 (2003) (citing *State Sec. Ins. Co.* v. *Burgos*, 583 N.E.2d 547, 554, 145 Ill. 2d 423, 164 Ill. Dec. 631 (1991)). But an insurance policy "is not rendered ambiguous merely because the parties disagree on its meaning." *Cent. Ill. Light Co.* v. *Home Ins. Co.*, 821 N.E.2d 206, 214, 213 Ill. 2d 141, 290 Ill. Dec. 155 (2004) (citing *Johnstowne Ctr. P'ship* v. *Chin*, 458 N.E.2d 480, 482, 99 Ill. 2d 284, 76 Ill. Dec. 80 (1983)). Like any contract, an insurance policy is to be construed as a whole, giving effect to every provision if possible. *See id.* at 213 (citing *Martindell* v. *Lake Shore Nat'l Bank*, 154 N.E.2d 683, 689, 15 Ill. 2d 272

(1958)).  The Illinois Supreme Court "has long established that the burden is on the insured to prove that its claim falls within the coverage of an insurance policy.  Once the insured has demonstrated coverage, the burden then shifts to the insurer to prove that a limitation or exclusion applies." *Addison Ins. Co.* v. *Fay*, 905 N.E.2d 747, 752, 232 Ill. 2d 446, 328 Ill. Dec. 858 (2009) (citations omitted).

**I.      Jury Trial**

ASIC objects to PRPC's request for a jury trial, arguing that it waived this right by failing to comply with Federal Rule of Civil Procedure 38.  *See* Fed. R. Civ. P. 38(b)(1) (parties have 14 days to demand a jury "after the last pleading directed to the issue is served").  But because the Church originally filed this suit in the Circuit Court of Cook County, Federal Rule of Civil Procedure 81 governs.  It provides that a party who files suit in state court and, "before removal, expressly demanded a jury trial in accordance with state law[,] need not renew the demand after removal."  Fed. R. Civ. P. 81(c)(3)(A).  Illinois law, in turn, provides that a plaintiff "desirous of a trial by jury must file a demand therefor with the clerk at the time the action is commenced." 735 Ill. Comp. Stat. 5/2-1105(a); *see also Winter* v. *Minn. Life Ins. Co.*, 199 F.3d 399, 406 (7th Cir. 1999) ("When Minnesota Life removed the case to federal court, Mr. Winter's jury demand was automatically preserved if it complied with Illinois law.").

Although there was no record of the jury demand in the papers ASIC filed when it removed this suit (*see generally* dkt. 1 & exs.), PRPC provided the court with a copy of the demand plus an affidavit from its attorney asserting that he filed a jury demand contemporaneously with the complaint. (*See* dkt. 85, ex. 2.)  Indeed, the exhibits demonstrate that the Cook County Clerk of Court stamped the jury demand and complaint just two minutes

apart. (*Id.* at 3; dkt. 1, ex. 1 at 4.) PRPC thus complied with Illinois law and preserved its right to trial by jury. This suit shall be tried to a jury unless the parties resolve it short of trial.

## II.     Flood Exclusion

The parties dispute whether there was a "flood" within the meaning of the Policy. Where the term is not defined in the insurance policy, the court defers to its plain and ordinary meaning. *Wallis* v. *Country Mut. Ins. Co.*, 723 N.E.2d 376, 381, 309 Ill. App. 3d 566, 243 Ill. Dec. 344 (2000). The plain and ordinary meaning of flood is "a rising and overflowing of a body of water that covers land not usually under water," and "floodwater" is "water that escapes from a watercourse in large volumes and flows over adjoining property in no regular channel." *Id.* (quoting Webster's Third New International Dictionary 873 (1993); Black's Law Dictionary 1585 (7th ed. 1999)) (brackets omitted). It does not matter whether the water escapes from a watercourse that was originally man-made or not "if the watercourse has a defined bed, visible banks, and a recurrent water flow." *Id.* at 383 (flood exclusion in plaintiffs' insurance policy barred recovery for damage caused by water that overflowed nearby, man-made creek and flooded plaintiffs' home ).

As the Church points out (and ASIC does not refute), the water did not escape from a body of water. There is no nearby stream or river that could have caused the flood and, as discussed below, the light well walkways are not water courses or defined water channels. At trial, ASIC cannot pursue its flood exclusion argument.

## III.    Anti-Concurrent Clause

The Church argues that the Policy's Rider, which deleted the exclusion for water backup, had the effect of deleting the anti-concurrent clause. The preamble to the Policy's exclusions, in § B.1 of the Policy, provides ASIC will not provide for "loss or damage caused directly or

10

indirectly" by excluded causes "regardless of any other cause or events that contributes concurrently or in any sequence to the loss." (Policy at 2.)

"[I]ndoresements to an insurance policy should [be] interpreted based on the policy as a whole." *Ryan Cos. US, Inc.* v. *Secura Ins. Co.*, No. 10 C 1035, 2011 WL 2940985, at *3 (N.D. Ill. July 21, 2011) (citing *Proin S.A.* v. *LaSalle Bank, N.A.*, 223 F. Supp. 2d 960, 966-67 (N.D. Ill. 2002); *Paris-Custardo* v. *Great Am. Ins. Co. of NY*, 844 N.E.2d 1011, 1014-15, 363 Ill. App. 3d 824, 300 Ill. Dec. 568 (2006)). "An indorsement is not to be construed more broadly than the fair import of its terms considered in connection with the whole of the policy." *Fid. & Cas. Co. of NY* v. *Mobay Chem. Corp.*, 625 N.E.2d 151, 159, 252 Ill. App. 3d 992, 192 Ill. Dec. 191 (1992) (quoting G. Couch, *Cyclopedia of Insurance* 2d, vol. 2, sec. 15:30 (1983)).

The Rider here clearly states that the Policy is only "amended as shown" and "all other text and provisions of the indicated items remain as written." (Rider at 14.) It deletes § B.1.g.3 of the Policy. Nothing in the Rider mentions the preamble to the exclusion section, and deleting the anti-concurrent clause along with the water back-up exclusion is nonsensical as it leaves §§ B.1.g.1, g.2, and g.4 without a preamble (not to mention §§ B.1.a-f and h). The Rider did not eliminate the anti-concurrent clause from the Policy.

## IV. Surface Water Exclusion

The parties dispute whether water that accumulated in the light wells and window wells is properly characterized as "surface water" under the Policy. If so, and if this water caused damage to the Church, coverage is excluded under the Policy.

"[S]urface water means water derived from natural precipitation that flows over or accumulates on the ground without forming a definite body of water or following a defined watercourse." *Smith* v. *Union Auto. Indemnity Co.*, 752 N.E.2d 1261, 1268, 323 Ill. App. 3d

11

741, 257 Ill. Dec. 81 (2001). Water does not lose its character as surface water merely because its flow has been altered in some way by a man-made object. *Id.* at 1267. For example, in *Smith*, the court found that water that entered the plaintiffs' window wells in their basement, causing the windows to break and their basement to fill with five feet of water, was surface water because there was no evidence "that the water emptied into plaintiffs' basement from a defined waterway or channel." *Id.* at 1268. Conversely, water that is diverted into a defined waterway or channel loses its character as surface water. *Id.*; *see also Heller* v. *Fire Ins. Exch.*, 800 P.2d 1006, 1009 (Co. 1990) (water that originated from natural runoff of melted snow but then was diverted into man-made trenches lost character as surface water). "[G]enerally, 'when water enters into a hole, flows into a sewer pipe, and from there enters and damages a building, the water does not constitute surface water.'" *Herrington, Inc.* v. *City of Geneva*, 2012 IL App (2d) 120131-U, ¶ 39 (2012) (unpublished) (quoting Lee R. Russ & Thomas F. Segalla, 11 Couch on Insurance 3d § 153:57 (Nov. 2011)).

The question is thus whether the light wells from which water likely entered the Church's building were intended to divert water. *See Am. Fam. Mut. Ins. Co.* v. *Schmitz*, 793 N.W.2d 111, 118 (Wis. 2010) (coverage excluded by surface water provision where water flowed into trenches on homeowner's property but the trenches were "not created for the purpose of diverting water"). The Church argues that when water entered the light wells, it lost its character as surface water because it formed a "definite body of water after following a defined watercourse, all as intended by the Church" given that the Church has storm drains in the light wells and directs water from the roof gutters to them. (Dkt. 78 at 5.) It supports its argument with the facts that there are drains built into the light wells and that the roof gutters are directed into the light wells. ASIC responds that, like the window wells in *Smith*, the light wells here

12

were not created with the intention of diverting water, and that their primary purpose is to provide light, egress, and ingress by code. It also notes that the buildings were not designed to have rainwater from the roof discharge into the light wells and if the Church decided to do so, that "does not miraculously transform a light well walkway into a 'definite body of water' or 'defined watercourse.'" (Dkt. 75 at 6.) Both parties cite to the testimony of David McClean, a forensic engineer with Donan Engineering Company, who prepared a report for ASIC's adjuster. McClean reported that the downspouts for the buildings were modified to discharge into the light wells and testified to similar points at his deposition. (Dkt. 76, ex. 3 at 34; *id.* ex. 2 at 25.) But he also testified that the primary purpose of window wells and light well walkways was light, ingress, and egress; the stairwells up from the light well walkways were not built as part of the draining system; and that the buildings' blueprints demonstrate that they were not designed to have downspouts or any drainage dump water directly into the light wells. (*Id.* ex. 2 at 44, 45, 50.)

While PRPC may have directed water into the light well walkways at some point, there is no genuine dispute of material fact that the water was surface water and that the light well walkways did not constitute definite bodies of water or defined water courses.[4] McClean testified that the light well walkways were not intended as defined water courses as evidenced by blueprints, and this testimony went uncontradicted. And the court is persuaded by *Angott* v. *Great Northern Insurance Company*, No. 05-72115, 2006 WL 1328874 (E.D. Mich. May 15, 2006), where the court concluded that even water in a manmade basin that had a drain at the

---

[4] Even the Church admits this by its implicit contradiction in its briefing. In the section of its brief explaining why no flood occurred, it states, "First, there is no evidence from which a reasonable jury can find that the walkways were a water course. There is no evidence that there was a defined bed, visible banks, or a recurrent water flow." (Dkt. 69 at 12.) It then insists that the water that flowed into the light well walkways "followed a defined water course to get to the light wells, *or* once there, the water formed a definite body of water." (Dkt. 86 at 2 (emphasis in original).)

bottom retained its character as surface water. The court found that water that filled an excavated area in a demolition site did not lose its character as surface water despite evidence that there was a pipe at the bottom of the excavation to allow any water entering it to drain out. *Id.* at \*\*2-4. The cases on which PRPC relies are distinguishable.[5] Because there is no genuine dispute as to whether water in the light wells was surface water, the Church cannot make this argument at trial.

## IV. Remaining Issues For Trial

### A. Sources of Water Damage

Because the anti-concurrent clause remains, the central question is whether the damage was caused only by the pump failure and subsequent drain back-up, or also by an excluded force such as ground or surface water. Moreover, not only is the question of causation at issue, but so is the question of relative causation.

As brought to light by the parties' experts, the cause of the water damage is a genuine dispute of material fact. ASIC points to the fact that during his deposition, Koenig cited other sources of water that caused the damage, including ground and surface water. But even so, he did not comment on the amount of damage that each source did. Illinois courts have identified relative causation as being key in applying an anti-concurrent clause. For example, in *Herrington*, the Illinois Appellate Court reversed summary judgment for the insurer where there

---

[5] *M&M Corporation of South Carolina* v. *Auto-Owners Ins. Co.*, 701 S.E.2d 33 (S.C. 2010), is distinguishable because the water that lost its quality as surface water there was "deliberately contained [and] concentrated" in a stormwater collection system. *Id.* at 34-35. *Selective Way Insurance Company* v. *Litigation Technology, Inc.*, 606 S.E.2d 68 (Ga. 2004), is distinguishable because the definition of surface water is not the same in Georgia as in Illinois. In Georgia, surface water is that which "is diffused over the surface of the ground, while it remains in such diffused state." *Id.* at 70 (emphasis omitted). In Illinois, however, water need not be diffuse to be surface water; its flow can be altered by a man-made object so long as it does not form a definite body of water or follow a defined watercourse. *See Smith*, 752 N.E.2d at 1267-68. And, as the Illinois appellate court pointed out in *Smith*, *Heller* is distinguishable because the court determined that the trenches that diverted the water there were "defined channels" such that the water lost its character as surface water. 800 P.2d at 1009.

14

was evidence that less than five percent of the water that caused damage to the plaintiff's property was due to a source excluded under the insurance policy, rainwater, but this water combined with a water source for which there was coverage, water that backed up through a sewer.[6] *Herrington*, 2012 IL App (2d) 120131-U, ¶¶ 47-48 ("[W]e conclude that there was a material factual question as to whether *all* of the water that entered the hotel was water that had backed up/surcharged from manhole H1; this includes the sub-question whether the presence of an unquantified or immeasurable, 'insignificant' amount (even a few raindrops) of surface water operates so as to preclude coverage.") (emphasis in original); *see also E.K.S., Inc.* v. *U.S. Fire Ins. Co.*, No. 97 C 2561, 1999 WL 299574, at *3 (N.D. Ill. May 3, 1999) (denying cross motions for summary judgment where parties disputed cause of water damage because "[w]e must determine whether the flood caused all of the water damage to the interior of plaintiffs' property [excluding coverage under the policy] or whether the water damage is attributable to water that entered through the roof [triggering coverage]. If both sources are a cause of the water damage, then we must determine how much water damage was caused by the flood and how much water damage was caused by openings in the roof.").

Here, there is inadequate information regarding the relative amounts of water that caused the damage. For example, if water *had* entered under the doors in the light well but the damage this water caused was minimal, then the anti-concurrent clause will not even come into play. Moreover, engineers called by both sides testified that if the pumps had been operating, "the flooding of the basement would likely not have occurred to the extent that it did, if at all." (Def.

---

[6] *Herrington* also distinguishes a case on which ASIC relies, *Front Row Theatre, Inc.* v. *American Manufacturer's Mutual Insurance Cos.*, 18 F.3d 1343 (6th Cir. 1994), because "it was undisputed in *Front Row Theatre* that the damage may have been caused by a *combination* of water that entered the drainage system and water that flowed over the manholes, did not enter the system, and flowed downhill into the insured's building." *Herrington*, 2012 IL App (2d) 120131-U, ¶ 43 (citing *Front Row Theatre*, 18 F.3d at 1348) (emphasis in original).

56.1 Resp. ¶ 15.) McClean admitted in his deposition that he does not state anywhere in his expert report that either the primary or sole cause of the damage was water entering under the doorways or through door jambs. (Dkt. 77, ex. 4 at 47.) This all calls into question the predominant cause of the water damage in the Church's basement.

The court is also unconvinced that the admissions made by PRPC's expert, Koenig, during his deposition are dispositive. Koenig made statements indicating that some harm was caused by "surface water" and "ground water," and that some water entered the basement under the doors in the light well walkways.[7] But he later clarified that his definition of surface water is not necessarily the same as that of Illinois law, and the question of relative amounts of damage caused by each source is still at issue. Although the Church's case is certainly weakened by Koenig's statements, there is still a dispute of material fact as to the causes of damage here. *See, e.g., Assurance Co. of Am., Inc.* v. *Jay-Mar, Inc.*, 38 F. Supp. 2d 349, 354-55 (D.N.J. 1999) (denying insurer's motion for summary judgment where factual dispute between parties' respective experts existed as to whether cause of loss was damage from sewer and drain backups or flooding and surface water). The record does not adequately deal with evidence of relative causation other than the parties arguing that the cause of damage they are asserting was the predominant one.[8] Thus, if the jury finds that a more than insubstantial amount of water damage was caused by a source excluded under the terms of the Policy then judgment for ASIC is appropriate, even if some damage was also caused by the pump failure and sewer backup.

---

[7] Even the Church itself writes that "there is a question of fact regarding whether water which had accumulated in the Church's light wells entered the basement from under a door, and caused the damage at issue in this case." (Dkt. 86 at 2.) Perhaps the Church should have realized that the fact it referred to open questions of material fact in its summary judgment briefing indicated that moving for summary judgment was wholly inappropriate in this dispute-laden case.

[8] Given the lack of testimony about relative causation in the record, it is unclear what evidence the parties will be able to present to the jury on this issue and how the jury will ultimately find, making the prospects of resolution short of trial all the more appealing for the parties.

### B. Illinois Insurance Code Section 155 And Advance Payment

The Illinois Insurance Code provides that a court may tax reasonable attorney fees and other costs against the insurance carrier "wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable." 215 Ill. Comp. Stat. 5/155(1). "An insurer's actions are not vexatious and unreasonable if '(1) there is a bona fide dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law.'" *TKK USA, Inc.* v. *Safety Nat'l Cas. Corp.*, 727 F.3d 782, 793 (7th Cir. 2013) (quoting *Citizens First Nat'l Bank of Princeton* v. *Cincinnati Ins. Co.,* 200 F.3d 1102, 1110 (7th Cir. 2000)). Given that this suit has not yet been resolved, the Church's motion for summary judgment on this count is denied Likewise, ASIC's claim to the $125,000 that it advanced the Church must wait until the conclusion of this suit and decision on whether there is coverage for the water damage under the Policy.

### C. Other Affirmative Defenses

Finally, PRPC argues that ASIC waived its affirmative defenses that the damage was caused by certain exclusions in the Policy, namely, the "utility services," "fungus," "seepage," "weather condition," "faulty design," and "rain" exclusions. But "[c]onceding a legal argument by failing to respond to it on summary judgment does *not* forever close the door—a litigant may put only her best foot forward in response to summary judgment without fear of waiving legal arguments not presented." *Van de Sande* v. *Van de Sande*, No. 05 C 1182, 2008 WL 239150, at *8 (N.D. Ill. Jan. 29, 2008) (citing *Flynn v. Sandahl,* 58 F.3d 283, 288 (7th Cir. 1995)).

Additionally, while ASIC may not have explicitly addressed each of these affirmative defenses in its briefing, it did point to related issues in its affirmative defenses in its memoranda and Local Rule 56.1 statements. It has not waived these defenses and may pursue them at trial (although its failure to rely on them at the summary judgment stage may be an indication of their relative merits).

## CONCLUSION

For the foregoing reasons, ASIC's motion for summary judgment is denied, but the application of the anti-concurrent clause and the fact that water in the light well walkways was surface water are established for trial. PRPC's motion is denied, although this case will be tried before a jury to which ASIC will not be able to argue the flood exclusion. The decisions of law in this opinion will govern the issues at trial. The parties should consult regarding the possibility of a consensual resolution of this suit or whether trial is necessary. If they proceed to trial, the parties should plan to focus on the relative amounts of harm caused by each water source. The parties will report on the status of their discussions at a hearing on October 14, 2014 at 11:00 a.m.

Date: September 17, 2014

U.S. District Judge Joan H. Lefkow